JOSEPH F. WALSH
Attorney at Law
California State Bar No. 67930
205 S. Broadway, Suite 606
Los Angeles, California 90012
Tel: (213) 627-1793
Fax: (213) 627-1711
Email: attyjoewalsh@aol.com

Attorney for Defendant
CHERYL PEREZ-CASTANEDA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR No. 18-172-GW |
| Plaintiff, | **DEFENDANT PEREZ-CASTANEDA'S POSITION OF THE PARTIES RE: SENTENCING** |
| v. | |
| CHERYL PEREZ-CASTANEDA, | Date: November 30, 2020 |
| Defendant. | Time: 8:00 a.m. |
| | Ctrm: Hon. George Wu |

The Defendant, CHERYL PEREZ-CASTANEDA, hereby

submits the following position of the parties concerning the

defendant's sentencing.

Dated: November 12, 2020          /s/ Joseph F. Walsh

                                  JOSEPH F. WALSH
                                  Attorney for Defendant
                                  CHERYL PEREZ-CASTANEDA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I**

**INTRODUCTION**

The Defendant, CHERYL PEREZ-CASTANEDA, has pleaded guilty to Count 1, Conspiracy to violate the RICO statute (18 U.S.C. 1962(d)), and Count 13, Aiding and Abetting the Possession, Use, or Carrying a Firearm in relation to a Crime of Violence, namely an Attempted Carjacking. (18 U.S.C. 924c). In this case, the Defendant pleaded guilty, but withdrew the plea due to a mistake in the First Plea Agreement, and then negotiated a different Second Plea Agreement, and again pleaded guilty a second time.

In the First Plea Agreement, the parties thought that the 924c firearms charge would only require a consecutive sentence if the second crime charged was a crime of violence.  In this case, RICO Conspiracy is not a crime of violence.  See, United States v Davis, 139 S.Ct. 2319 (2019). Thus, the Defendant believed that she could receive concurrent sentences for the RICO Conspiracy and the 924c firearms charges, making it possible for the Defendant to receive ten years on each count running concurrently, for a total sentence of ten years.

2

The Probation Officer in his Letter correctly noted that the mandatory sentence for the 924c firearms charge must be imposed consecutively to any other criminal charge and is not limited to being consecutive to crimes of violence.  Prob. Letter, p. 6.  Section 924 (c) (1) (D) (ii) provides that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed."

At that point, the Defendant had grounds to withdraw her guilty plea.  However, the Defendant did not wish to proceed to trial and wanted to resolve her case.  The Defendant and the Government negotiated a Second Plea Agreement.  She pleaded guilty to the same to charges, RICO Conspiracy and the 924c firearms charge.  The agreement expressly advised that the sentence on the 924c firearms charge required a mandatory minimum consecutive sentence of ten years.  The Government agreed to recommend that the Defendant be sentenced to a total term of imprisonment on all counts of no more than 180 months.  Revised Plea Agreement, p. 2, para. 3(e).

**II**

**UNDER NINTH CIRCUIT CASE LAW, SPECIFIC PERFORMANCE
OF THE PLEA AGREEMENT MAY BE REQUIRED IN CASES
WHERE WITHDRAWAL OF THE PLEA WOULD EXPOSE THE
DEFENDANT TO AN EXTREMELY LONG SENTENCE AFTER A
TRIAL**

In the First Plea Agreement, the Defendant tried to
negotiate a plea agreement that would avoid her being given
a mandatory consecutive ten years for the 924c firearms
charge.  The 924c firearms charge alleged that the Defendant
aided and abetted in a co-defendant's discharge of a firearm
during the crime of Attempted Carjacking.  The Defendant
mistakenly thought that by not pleading guilty to the
Attempted Carjacking charge, the 924c firearms charge could
run concurrently to the RICO Conspiracy charge.

The First Plea Agreement was signed and the
Defendant pleaded guilty mistakenly thinking that it was at
least possible that she could receive concurrent ten year
sentences on both the RICO Conspiracy and the 924c charge.
The First Plea Agreement and first guilty plea have both
been vacated.  Faced with the unacceptable alternative of
going to trial on the entire indictment, the Defendant
entered into the Second Plea Agreement and pleaded guilty
again to Counts 1 and 13.

In the Second Plea Agreement it was made

clear that the 924c firearms sentence of ten years must be imposed consecutively to the sentence on the RICO Conspiracy.  In an effort to reach an agreement in negotiating the Second Plea Agreement, the Government has agreed to recommend that the Defendant be sentenced to a total term of imprisonment on all counts of no more than 180 months.

The Defendant asks the Court to sentence the Defendant consistent with the expectations of the parties at the time that the First Plea Agreement was entered into. Under the original plea agreement, the Defendant had a right to ask the Court to sentence her concurrently on the two crimes and receive a total sentence of 120 months or 10 years.  This Court could sentence the Defendant in such a way that both takes into consideration the original mistaken expectations of the parties and the legal requirement of imposing a consecutive firearms sentence.

The Defendant asks the Court to sentence her to 1 month on Count 1 plus a consecutive sentence of 120 months on Count 13, for a total sentence of 121 months.  Such a sentence would be consistent with the First Plea agreement and the understanding of the parties at the time the First Plea agreement was signed.  It would necessarily require the Court to grant a downward departure or variance to 1 month

on the sentence on Count 1, RICO Conspiracy.  Such a variance could be justified based on the legal principles related to specific performance of plea agreements.

The United States Supreme Court has stated that "[w]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello v New York, 404 U.S. 257, 262 (1971).  In Buckley v. Terhune, 441 F.3d 688, 694 (9th Cir. 2006) (en banc), the Ninth Circuit stated that "Under Santobello v. New York, 404 U.S. 257, 261-62, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971), a criminal defendant has a due process right to enforce the terms of his plea agreement."

In Cuero V Cate, 827 F. 3d 879 (9th Cir. 2016) the defendant entered a guilty plea under plea a agreement that promised him a sentence of 14 years, 4 months.  Before sentencing, the prosecutor filed a prior strike under the Three Strikes Law which doubled the sentence.  The state court judge allowed the prosecutor to seek the higher sentence and refused to sentence the defendant according to the plea agreement.  The federal court ordered the plea agreement to be honored and to allow the defendant to receive the agreed upon sentence set forth in the plea agreement.  Specifically, the Court held that allowing the

defendant to withdraw the plea was no remedy because it

would expose the defendant to an extremely long potential

sentence after conviction at a trial.  The Court stated:


> Moreover, that the state court permitted Cuero
> to withdraw his plea did not "repair the harm"
> caused by the prosecutor's breach. To the
> contrary: It exposed Cuero to the risk of going to
> trial and receiving an indeterminate 64 years to
> life sentence. This is hardly the "remedy" Cuero
> would have elected had he properly been given a
> choice. That Cuero was ultimately able to
> ''bargain'' for an indeterminate 25 years to life
> sentence does not alter the analysis; the state
> could not have lawfully pursued an indeterminate
> life sentence in the first place if it had not
> been allowed to breach the plea agreement. Again,
> Cuero had performed his part of the agreement by
> pleading guilty to the two felony charges,
> admitting a single prior strike, and conceding his
> four prison priors, giving the government the
> bargain it sought. Because Cuero had already
> performed, "fundamental fairness demands that the
> state be compelled to adhere to the agreement as
> well." (citation omitted). Cuero is therefore
> entitled to the benefit of his original bargain: a
> maximum sentence of 14 years, 4 months in prison.
> (827 F. 3d at 891.)


Although the Defendant Perez has now enter into an

amended plea agreement, the amended agreement is harsher

than the original agreement.  The only way to get

the Defendant back to where she was at the time of the

original plea agreement is to sentence her to 1 month on

Count 1 and a consecutive 120 months on Count 13, for a

total sentence of 121 months.

The Government may argue that the case of <u>Cuero v</u>
<u>Cate</u> was reversed by the United States Supreme Court in
<u>Kernan v Cuero</u>, 138 S. Ct. 4 (2017). But the reversal was
on the grounds that the state court decision denying Cuero
habeas relief was not a decision that was an unreasonable
application of federal constitutional law as decided by the
United States Supreme Court, as required by the AEDPA.
After remand to the Ninth Circuit, Circuit Judge Wardlaw
stated that the state court could reconsider whether Cuero
had been denied due process by the refusal to grant
specific performance of the plea agreement because the
Supreme Court had only held that "the state court is not
required to do so by clearly established Supreme Court law."
<u>Cuero v Kernan</u>, 913 F3d 1157, 1158 {9th Cir. 2019).

In Defendant Perez Castaneda's case, the
limitations of AEDPA do not apply and the original
discussion of specific performance of plea agreements in
<u>Cuero v Cate</u> is still an accurate summary of the law.
Lastly, the Defendant is not saying she was promised a
concurrent sentence of 10 years. She is only saying that
she had a realistic chance of receiving no more than 10
years under the original plea agreement. She may still have
that chance but it may be more difficult under the Second
Plea Agreement.

### III

**THERE ARE SEVERAL MITIGATING FACTORS THAT WOULD
WARRANT A SENTENCE OF NO MORE THAN TEN YEARS IN
THIS CASE**

**A. Post Offense Rehabilitation**

The Defendant was arrested on May 3, 2018.  This
was based on an Indictment that alleged the Defendant was
committing crimes during 2013.  The Overt Acts in the
Indictment allege that the Defendant was collecting tax
money in 2012 and 2013.  The alleged assault in the jail
occurred in 2013 and the attempted carjacking occurred in
2013.  Thus, by the time of her arrest, five years had
passed since the Defendant was actively involved in criminal
conduct.

By 2018 and the day of her arrest, the Defendant
had removed herself from the criminal activity that she had
been involved in.  She was living with her two daughters and
was taking care of her five grandchildren.  Her sole source
of income was her disability check from the government.  She
had no involvement in criminal activity in 2018 at the time
of her arrest.  On her own, she had rehabilitated herself.

In her letter to the Court, she writes that after
suffering all the losses and deaths in her life, she gave in
to stress and depression.  It was during that time that she
made her biggest mistakes and got involved in criminal

behavior.  However, several years before her arrest, she "gave her life to God."  She began attending church services with her daughters and became "closer to God than I've ever been."  She describes herself as "a changed person." Defendant's Letter.

She has attended numerous classes while in custody awaiting resolution of her case.  The certificates of completed class work are attached as exhibits to this brief. Also attached are some of her excellent work records at MDCLA.  Based upon all of the these, the Defendant asks the Court to consider her post-offense rehabilitation as a mitigating factor in her case.  See, <u>Pepper v United States</u>, 562 U.S. 476 (2011) [A court may consider post-offense rehabilitation as a mitigating factor].

**B. The Tragic Loss of Her Two Children**

In 2013, the Defendant suffered the loss of two of her grown children.  Both were killed in violent confrontations.

In March of 2013, the Defendant's daughter, Sonia Castaneda-Montoya, age 28, was shot and killed by the police while she was standing in the driveway of a motel.  The police claimed that she had a gun, but no gun was found in her possession.  The City of Pomona settled a lawsuit over

the death of Sonia because the facts of the case did not justify the shooting.  The Defendant was devastated by the sudden death of her daughter.  The Defendant suffered a stroke and was hospitalized for three days.  PSR., p. 20, par. 130.

In December of 2013, the Defendant's son, Fred Aguirre, age 23, was shot and killed by a man with whom he had an ongoing dispute.  Although the man who killed her son was arrested by the police, he was released and never charged because the police decided the man acted in self defense.  After the loss of two children in one year, the Defendant suffered a deep depression.  PSR., p. 20, par. 131.

The Court should take these tragic deaths into consideration when sentencing the Defendant.  She has suffered terribly as a result of the tragic deaths of her children.  See, United States v Collington, 461 F. 3d 805 (6th Cir. 2006) [Mitigating factors considered were that the defendant's father was murdered when defendant was 9 years old and his mother died soon thereafter].

## C. The History of Being a Victim of Domestic Violence

The fact that a defendant has been a victim of domestic violence is a mitigating factor that a Court may

consider at the time of sentencing.  <u>United States v Lopez</u>, 938 F. 2d 1293, 1298 (D.C. Cir. 1991) [Exposure to domestic violence may be considered as a mitigating factor].  In this case, the Defendant was a victim of severe domestic violence during her first marriage.

Her husband, Fred Aguirre, was physically abusive, causing injuries on many occasions.  Her husband used heroin and was in and out of prison during their relationship.  She eventually left him because she "was tired of being hit." PSR., p. 19, par. 125.

Her second husband, Viviano Perez, was also a heroin addict.  He failed to provide the Defendant with a stable home and income.  As a result, the Defendant and her husband became homeless for two years and her children had to live with various relatives.  They lived for a time in her mother's garage.  PSR., p. 19, par. 128.

In January of 2012, Viviano passed away from a heart attack.  When he was alive, Viviano collected gang taxes for co-defendant, Michael Lerma.  PSR., p. 19, par. 127, 129. It was shortly after his death that the Defendant started becoming involved in the same activity, undoubtedly motivated by her extreme poverty and her husband's bad influence on her during his lifetime.

**D. A Prior Addiction to Drugs**

A person's addition to drugs is generally considered to be a mitigating factor in federal sentencing. It is part of the "history and characteristics of the defendant" within the meaning of 18 U.S.C. 3553(a)(1). United States v Hendrickson, 25 F.3d 1166 (N.D. Iowa 2014).

In this case, the Defendant became involved with using drugs through her two husbands. She used PCP with her first husband, Fred Aguirre, for ten years. She used methamphetamine with her second husband, Viviano Perez, while she was homeless. After that, she used opiates and pain medication on a daily basis. PSR, p. 21-22, par. 145-148.

An addiction to drugs frequently results in a person being unable to control their impulses and causes them to make poor judgments. All of the Defendant's poor choices, that she made in this case, coincided with her addiction and use of drugs.

**E. Strong Family Support and Involvement in Religion**

The Defendant has strong family support. Angela Rocha is the sister of the Defendant. She is a Pastor. She was instrumental in helping the Defendant change her live and turn toward religion. She writes that "Cheryl had

turned her life over to Jesus Christ 8 years ago, her life
was a total transformation, going to church [and] being
involved in the Women's Ministry."  "Cheryl has had a change
in life."

Her brother in law, Jimmy Rocha, is also a Pastor.
He writes that "Becoming a better Mother and Grandmother,
Cheryl began to draw her faith closer to God, and changed
the direction of her life, her positivity and investment in
her family."   Patty Nides is another sister of the
Defendant.  She writes that "Cheryl for the last 8 years has
been involved in the church and was a mentor to her children
and grandchildren."   She states that "I feel that Cheryl
has changed her life [and] grows as she found worship and
prayer to guide her in life."

In her letter to the Court, the Defendant
acknowledges the support she has received from her family.
With the help of her sister, the Defendant has turned to
religion to help her change her life.  At sentencing, it is
appropriate for the Court to consider the Defendant's family
circumstances to the extent that they may warrant a lesser
sentence.  See, United States v Menyweather, 447 F.3d 625,
634 (9th Cir. 2006).

**IV**

**THE GUIDELINE CALCULATIONS FOR RICO CONSPIRACY SHOULD
NOT INCLUDE INCREASES FOR VICTIM RESTRAINT AND
AGGRAVATED ROLE IN THE OFFENSE AND THE C.V. MURDER
CONSPIRACY SHOULD NOT BE A PART OF THE DEFENDANT'S
RELEVANT CONDUCT**

The Probation Report recommends a 2 level increase
in the offense level for physical restraint of a victim
under Guidelines 3A1.3, based on Carlos Gonzalez handcuffing
victim C.V.  PSR, p. 14, para. 91.  The report also
recommends a 3 level increase in the offense level for an
aggravated role in the offense under Guidelines 3B1.1, based
on the Defendant's directing co-defendants to commit
criminal acts and authorizing the murder of C.V.  PSR, p.
14, para. 92-93.

The Defendant objects to these upward adjustments
because they are not supported by the facts.  By the same
token, the Defendant objects to the inclusion of the
Conspiracy to Murder C.V. as a part of the Defendant's
relevant conduct.  PSR, p. 11-12, para. 72-77.

The Probation Officer failed to recognized that in
the Defendant's Factual Basis section of her Plea Agreement
with the Government, the Defendant did not admit any facts
related to the Conspiracy to Murder C.V.  Revised Plea
Agreement, pp. 8-14.  Although an early version of the plea

agreement contained those facts, they were removed as a part of the plea negotiations.  They were removed because the Defendant was not involved in the murder conspiracy and could not truthfully admit such a crime during the guilty plea proceedings.

The Defendant admitted in the factual basis to the crime of conspiracy to assault or murder S.L. in the jail. S.L. had shot her son Fred in the leg and the Defendant was angry and wanted S.L. punished for hurting her son.  S.L. was eventually assaulted in the jail, but it was not a life threatening injury.  Co-Defendant, Jose Montano,  has pleaded guilty to the assault and this Court sentenced him to 24 months.  PSR, p. 7. para. 21.

As a part of the plea negotiations, the Defendant agreed that the conspiracy to assault S.L. could potentially have resulted in death and therefore Defendant agreed the Level 33 Guidelines for Conspiracy to commit Murder.  The Defendant did not agree to the Conspiracy to Murder C.V. In other words, the Government got the Level 33 murder Guidelines and the Defendant got the C.V. murder conspiracy removed.

The probation report correctly summarizes the roles of the actual C.V. kidnappers and murder conspirators. C.V., Carlos Gonzalez, and Juan Sanchez, were involved in

check fraud, identity theft, and counterfeiting.  There was

a falling out amongst them and C.V. was held for several

weeks by Carlos Gonzalez and Juan Sanchez.  During that time

they had tried to extort money from her.  It was the

prosecution's theory that Gonzalez and Sanchez wanted to

kill C.V. because she knew too much about their criminal

activities.  R.R. a friend of C.V. alerted the police.

        C.V. was rescued by the police from a car.  C.V.

had been handcuffed and threatened with a gun by Gonzalez

and Sanchez, who were in the car, along with R.R.

Gonzalez and Sanchez were charged and convicted of kidnaping

C.V. in State Court.  At the preliminary hearing, C.V. and

R.R. testified against Gonzalez and Sanchez and never

mentioned any involvement by the Defendant in the crime.

        That is where the case stood, until sometime later,

a confidential informant with gang ties claimed the Defendant

was at a meeting where she authorized the murder.  This the

Defendant adamantly denies.  Ironically, the Probation

Officer states in his report that he "has no information

regarding the victim of the conspiracy to murder, C.V."  PSR,

p. 12, para. 80.  According to the discovery, C.V. has never

claimed that the Defendant had anything to do with her

mistreatment by Gonzalez and Sanchez.

In conclusion, the Court should not increase the Defendant's offense level for victim restraint or for aggravated role in the offense.  The C.V. murder conspiracy should not be included in the PSR as relevant conduct of the Defendant.  For argument sake, a 2 level increase for role in the offense may be possible, but certainly not a 3 level increase.  With a 2 level role increase, the final offense level is level 32 with a sentence range of 121 to 151 months.  Without a role increase, the offense level is level 30 with a sentence range of 97 to 121 months.

Either calculation puts the RICO charge within the 120 months range, which mirrored the 120 months for the 924c charge, and explains why the Defendant had a reasonable expectation, under the First Plea Agreement, that she could argue for a total concurrent sentence of 120 months.

# V

## SENTENCE RECOMMENDATION

As noted in the Introduction, the Defendant asks the Court to sentence her to a sentence of no more than 121 months or 10 years and 1 month, consisting of 1 month on Count 1 and a consecutive 120 months on Count 13.  This is adequate punishment for her crime.  Based on her age (58),

no more is necessary.  Upon her release, she will desire no more than to return to being a mother and grandmother, a role she was fulfilling at the time of her arrest two years ago in 2018.


Dated: November 12, 2020              Respectfully Submitted,

                                      /s/ Joseph F. Walsh
                                      JOSEPH F. WALSH
                                      Attorney for Defendant
                                      JESSIE JUAN LEON

## **PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.

    I am over the age of 18 and not a party to the within action; my business address is 205 S. Broadway, Suite 606, Los Angeles, California 90012.

    On November 12, 2020, I served the foregoing document described as **DEFENDANT PEREZ-CASTANEDA'S POSITION OF THE PARTIES RE: SENTENCING** on interested parties in this action by email:

MAX B. SHINER
ASSISTANT U.S. ATTORNEY
max.shiner@usdoj.gov

SCOTT SHAFER
U.S. PROBATION OFFICER
scott_shafer@cacp.uscourts.gov

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

    Executed on November 12, 2020 at Los Angeles, California.

                    /s/ Joseph Walsh
                    JOSEPH WALSH